**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MARJORIE ANN TAYLOR,        )
                                 )
            Plaintiff,      )        Civil Action No. 12-169
                                 )
           v.             )        Judge Sean McLaughlin
                                 )        Magistrate Judge Susan Baxter
COMMISSIONER OF          )
SOCIAL SECURITY,         )
                                 )
           Defendant.     )

# MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that the court deny Plaintiff's Motion for Summary Judgment [ECF No. 9], grant Defendant's Motion for Summary Judgment [ECF No. 13], and affirm the decision of the administrative law judge ("ALJ").

## II. REPORT

**A. BACKGROUND**

1. Procedural History

Marjorie Ann Taylor ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 401 – 433, 1381 – 1383f ("Act").  Plaintiff filed for benefits on January 29, 2010.  (R. at 122 – 27).[1]  Plaintiff initially claimed that she was unable to work as a result of severe ulnar neuropathy of the left elbow and severe atrophy of the left hand, and that her alleged disability began on May 24, 2005[2].  (R. at 122 – 27, 149).  Despite her claims, Plaintiff was denied benefits under the Act.  (R. at 1 – 6, 19 – 30).  Having exhausted all administrative remedies, this matter now comes before the court on cross motions for summary judgment.  (ECF Nos. 9, 13).

2.  Case Record

The facts relevant to the present case are limited to those records that were available to the ALJ when rendering his decision.  (R. at 27 – 30).  All other records newly submitted[3] to the Appeals Council or this court will not be considered, here, and will not inform the decision of this court. *See Matthews v. Apfel*, 239 F. 3d 589, 592, 594 – 95 (3d Cir. 2001).[4]

---

[1]    Citations to ECF Nos. 6 – 6-9, the Record, *hereinafter*, "R. at __."

[2]    Plaintiff's January 29, 2010 applications for DIB and SSI both indicated that Plaintiff's alleged disability began on May 24, 2005.  (R. at 122 – 27).  Plaintiff previously filed for DIB and SSI on June 19, 2006, claiming a disability onset of May 24, 2005.  Plaintiff's claim was denied in a decision dated July 25, 2008.  (R. at 69 – 83).  There is no record of a request for review by the Appeals Council or of the filing of a complaint in the United States District Court following the denial.  Plaintiff did not seek to re-open the matter.  Plaintiff acknowledged at her hearing that, as a result, the earliest that disability could be found was after July 25, 2008.  (R. at 35 – 36).

[3]    Exhibits 11E, 12E, 16F; R. at 4 – 5, 198 – 202, 360 – 81.

[4]    Although Plaintiff has not specifically requested a remand based on new evidence of a mental health disability (at Exhibits 11E, 12E, and 16F), even if she had, the Court should deny the request because Plaintiff has failed to meet her burden to prove that such a remand is warranted.  The Appeals Council may decline review of a claimant's case when the ALJ's decision is not at odds with the weight of the evidence on record.  *Matthews*, 239 F. 3d at 592.  In such a case, a district court can only review that evidence upon which the ALJ based his or her decision.  *Id.* at 594 – 95.  As a result, new evidence presented by a claimant to the Appeals Council, but not reviewed, is not within the purview of a district court when judging whether substantial evidence supported an ALJ's determination.  *Id.*  Such is the case at present.  Additionally, Plaintiff failed to make the required showing under *Szubak v. Secretary of Health and Human Services*, 745 F. 2d 831 (3d Cir. 1984), for remand to reconsider the case in light of newly submitted evidence not considered by the ALJ when making his decision.  Therefore, the case will not be remanded for this purpose, and Exhibits 11E, 12E, and 16F (R. at 198 – 202, 360 – 81) will not be reviewed or discussed.

### 3. General Background

Plaintiff was born on May 28, 1963, was forty six years of age at the time of her application for benefits, and was forty seven years of age at the time of her administrative hearing before the ALJ. (R. at 145). Plaintiff had a high school education, and received vocational training as a nurse's aide. (R. at 150). Plaintiff's relevant work history included employment as a cashier from 1989 until 1990, and as a nurse's aide from 1994 until 2005. (R. at 150). She had not worked since 2005. (R. at 149). She subsisted on food stamps and cash assistance from the state. (R. at 37).

Plaintiff lived alone in a mobile home that she owned. (R. at 37). Plaintiff was capable of self-care, maintaining her home, and driving for groceries, appointments, and other errands. (R. at 39, 48 – 49, 52). However, Plaintiff claimed that her pain substantially limited the degree to which she was able to engage in these activities of daily living, and often motivated her to put off certain activities to avoid pain. (R. at 46, 51). Plaintiff also generally avoided going out and socializing. (R. at 40). She did not like to be around others when experiencing discomfort. (R. at 40). Plaintiff's pain prevented her from enjoying a restful sleep, and her poor sleep patterns, as well as side effects of her medication, made Plaintiff fatigued and drowsy during the day. (R. at 42 – 47, 50).

### 4. Treatment History

Plaintiff visited electrodiagnostic and rehabilitative pain management specialist Theresa A. Wheeling, M.D. beginning in June 2005 for diagnostic studies of her left arm following six months of numbness and weakness, particularly in the 4th and 5th digits of the left hand. (R. at 256 – 57). Plaintiff had a "claw hand," and also complained of pain in the neck and shoulder.

(R. at 256 – 57).  An EMG test demonstrated severe neurapraxic ulnar neuropathy at the cubital tunnel in Plaintiff's left arm.  (R. at 256 – 57).

On July 19, 2005, hand microsurgery and reconstructive specialist Mary Beth Cermak, M.D. performed submuscular transposition of the ulnar nerve in Plaintiff's left elbow to treat diagnosed left cubital tunnel syndrome after the failure of more conservative care.  (R. at 232). The ulnar nerve was moved to provide a straight pathway.  (R. at 232).  Dr. Cermak referred Plaintiff for physical therapy after her surgery.  Plaintiff engaged in therapy from August 2005 until December 2005.  (R. at 233 – 34, 237 – 38).

A note from Plaintiff's physical therapist to Dr. Cermak summarizing Plaintiff's course of treatment and her condition was written on December 19, 2005.  (R. at 233).  Therapy focused on general muscle strengthening in the left arm.  (R. at 233).  Despite treatment, Plaintiff continued to complain of intermittent stabbing pain in the left elbow.  (R. at 233).  Plaintiff's strength and range of motion in the left elbow were normal, however.  (R. at 233).  Plaintiff's left hand had some weakness, and her grip strength in the left hand was thirty pounds – as compared to seventy five pounds in the right hand.  (R. at 233).  She exhibited poor abduction and adduction of the 4th and 5th digits on her left hand.  (R. at 233).  Dr. Cermak's treatment notes following surgery corroborated the physical therapist's findings.  (R. at 300 – 08).

Following her ulnar decompressive surgery with Dr. Cermak, Plaintiff returned to Dr. Wheeling for further diagnostic studies of her left arm in January and April 2006.  (R. at 253 – 56).  EMG testing showed definite improvement in ulnar nerve conduction.  (R. at 253 – 56). However, the improvement was limited, and Plaintiff's prognosis was "guarded."  (R. at 253 – 56).  Plaintiff suffered from left ulnar neuropathy with significant axonal damage.  (R. at 253 –

56).  Dr. Cermak's treatment notes from the same general period were in accord.  (R. at 310 –
14).

In a June 26, 2006 treatment note, Dr. Wheeler indicated that a post-operative complication had worsened Plaintiff's ulnar functioning.  (R. at 252).  In spite of continuing physical therapy exercises at her home, Plaintiff continued to exhibit atrophy of the muscles in her left hand.  (R. at 252).  While Plaintiff did experience some improvement following her surgery with Dr. Cermak, the possibility of returning to work as a nurse's aide – which involved moving people in bed, changing bedding, pushing, pulling, and grabbing – would not be likely for a significant period of time.  (R. at 252).  Nonetheless, Dr. Wheeler did believe that Plaintiff would be able to find work to accommodate her limitations.  (R. at 252).

By August 2, 2006, Dr. Wheeler opined that Plaintiff was experiencing improvement in functioning.  (R. at 251).  However, there was still significant atrophy of the left hand, and diminished grip strength.  (R. at 251).  Dr. Wheeler still felt that Plaintiff could not return to her former job, and that repetitive activity with the left hand for either fine manipulation or gross grasping was not possible.  (R. at 251).  In spite of use of electrical stimulation, and aggressive at-home therapy, Dr. Wheeler believed that it would take up to two years for Plaintiff to see her maximum improvement.  (R. at 251).

Plaintiff was examined by Dr. Wheeler in November 2006.  (R. at 250).  Plaintiff continued to show improvement in functionality, and her left hand was losing its "claw appearance." (R. at 250).  However, Dr. Wheeler noted that the left hand would not likely return to full functionality.  (R. at 250).  Plaintiff had managed her pain with Lyrica and Cymbalta.  (R. at 250).  She decided to stop taking these medications for a period, only to experience a return of neuropathic symptoms that interrupted her sleep.  (R. at 250).

In May 2007, Dr. Wheeler examined Plaintiff at a regular follow-up appointment and noted continued improvement in her left hand. (R. at 248 – 49). Plaintiff was still experiencing some left arm weakness, and atrophy of the left hand was still apparent. (R. at 248 – 49). Plaintiff complained of feelings in her right arm similar to those she experienced in her left before she started to have difficulty. (R. at 248 – 49). Dr. Wheeler found no evidence of right arm abnormality. (R. at 248 – 49). Plaintiff had to stop taking her prescription medications due to a loss of medical insurance. (R. at 248 – 49). However, Dr. Wheeler felt that Plaintiff had reached the point where she could engage in gainful employment at the sedentary or light duty level, if she could avoid repetitive activity with the left hand and be allowed frequent breaks. (R. at 248 – 49). Plaintiff was advised to begin vocational therapy. (R. at 248 – 49).

At an August 2007 examination with Dr. Wheeler, Plaintiff's left hand revealed marked improvement since surgery. (R. at 247). Plaintiff still experienced some weakness and exhibited atrophy, but had better movement, particularly in her fingers. (R. at 247). Plaintiff was limited by her income and lack of comprehensive medical insurance in terms of the therapies she could seek. (R. at 247). Dr. Wheeler again advised Plaintiff to engage in vocational rehabilitation. (R. at 247).

Dr. Wheeler saw Plaintiff in February 2008 for a physical examination of Plaintiff's left arm. (R. at 246). Dr. Wheeler noted that there was still weakness and atrophy in the left arm and hand, but that these conditions had improved significantly since Plaintiff's surgery. (R. at 246). Plaintiff occasionally took Lyrica when she experienced bad burning or tingling sensations, as she still could not pay for prescriptions. (R. at 246). Plaintiff expressed to Dr. Wheeler that she was upset because of a recent functional capacity evaluation in which Plaintiff's therapist implied that she was faking her pain. (R. at 246). Dr. Wheeler replied that while there was no

objective way to measure pain, the objective testing showed that Plaintiff had definite neurological injury and definite neurological weakness. (R. at 246). Those conditions notwithstanding, Dr. Wheeler also stated that Plaintiff was "really doing quite well." (R. at 246).

Plaintiff was seen at Elk Valley Medical Center by her primary care physician Adrienne Gerhart, D.O. in November 2009 for complaints of ulnar pain in her left arm. (R. at 209 – 12). Plaintiff was seeking completion of paperwork for public assistance and medical benefits. (R. at 209 – 12). Due to the recent loss of long-term disability benefits, Plaintiff had not had any insurance coverage. (R. at 209 – 12). Plaintiff had resorted to smoking marijuana for pain relief. (R. at 209 – 12). Upon physical examination, no motor dysfunction was observed; however, weakness with flexion of the left hand and loss of fine motor skills was noted. (R. at 209 – 12). Prescription Elavil was provided for Plaintiff's ulnar pain. (R. at 209 – 12).

Plaintiff followed up with Dr. Gerhart in December 2009. (R. at 207 – 08). Plaintiff had stopped taking the Elavil because she claimed that it made her very fatigued. (R. at 207 – 08). Plaintiff had scheduled a consult with a surgeon regarding her ulnar pain. (R. at 207 – 08). Physical examination revealed loss of thenar eminence/contracture of the 4th and 5th fingers on Plaintiff's left hand. (R. at 207 – 08). Plaintiff was noted to still be using marijuana. (R. at 207 – 08). She was provided with a new prescription for Lyrica for her ulnar pain. (R. at 207 – 08).

Plaintiff was seen again by Dr. Gerhart in January 2010. (R. at 205 – 06). Plaintiff reported being capable of large movements with her left hand, but that the pain caused by such movement would become intolerable over time. (R. at 205 – 06). Slight curling of the 4th and 5th digits on Plaintiff's left hand was noted, but she was able to straighten the fingers. (R. at 205 – 06). Sensation was intact to light touch, but Plaintiff reported tingling. (R. at 205 – 06). Plaintiff was provided with a prescription for Neurontin for her ulnar pain. (R. at 205 – 06).

In February 2010, Plaintiff appeared at Dr. Gerhart's practice for unchanged left hand pain. (R. at 203 – 04). Plaintiff did not feel that the prescribed Neurontin had provided any relief. (R. at 203 – 04). She also reported feeling tired and "in a fog." (R. at 203 – 04). Plaintiff also complained of the recent onset of pain and numbness in her right hand and wrist. (R. at 203 – 04). It was noted that EMG testing of the right hand had been normal in the past. (R. at 203 – 04). Plaintiff's 4th and 5th digits on her left hand were still slightly curled, but she was able to extend the fingers with ease. (R. at 203 – 04). Plaintiff's elbow had full range of motion, though with significant pain to palpation just distal to the ulnar nerve tunnel. (R. at 203 – 04). Reflex sympathetic dystrophy was suspected. (R. at 203 – 04). Plaintiff was referred to pain management for evaluation. (R. at 203 – 04). Plaintiff was also seen by Dr. Cermak in February 2010 with similar complaints and was advised to have more EMG testing. (R. at 319 – 20).

Plaintiff presented at the office of Dr. Cermak on March 18, 2010 for follow-up after a February 2010 appointment. (R. at 216 – 19, 321 – 22). At that time, the recent EMG testing results for Plaintiff's right hand were discussed. (R. at 216 – 17). The EMG was normal, in spite of Plaintiff's continued complaints of tingling and numbness in the right hand. (R. at 216 – 17). During examination of the left hand, a Tinel's Test was negative, a Phalen's test produced mild response, and there was no pain observed with elbow flexion for sixty seconds. (R. at 216 – 17). Unfortunately, due to alleged financial stressors, Plaintiff was unable to afford prescribed splints and medications for treatment. (R. at 216 – 17). Plaintiff declined to have an injection to alleviate her symptoms. (R. at 216 – 17). Plaintiff was diagnosed with an ulnar nerve lesion. (R. at 216 – 17).

Dr. Gerhart referred Plaintiff to Oluchi Ozumba, M.D. for a pain management consultation in May 2010. (R. at 339 – 42). Plaintiff informed Dr. Ozumba that since her

surgery she had experienced nuisance pain of a shooting, stabbing, sharp, tingling, cramping, and aching nature in her left forearm and hand. (R. at 339 – 42). Dr. Ozumba noted Plaintiff's past EMG results. (R. at 339 – 42). Plaintiff believed that her pain had impacted her sleep and activities of daily living. (R. at 339 – 42).

Upon examination, Dr. Ozumba observed Plaintiff to exhibit good judgment and insight, intact memory, and mood and affect within normal limits. (R. at 339 – 42). Plaintiff had atrophy, abnormal sensation, and decreased grip strength in the left hand. (R. at 339 – 42). Dr. Ozumba diagnosed hand pain, ulnar nerve palsy of the left arm, and reflex sympathetic dystrophy of the upper limb. (R. at 339 – 42). Plaintiff was noted to be highly sensitive to medications, and was prescribed Effexor for her pain. (R. at 339 – 42). Plaintiff's insurance coverage affected the medications available to her. (R. at 339 – 42). A nerve block was recommended, but Plaintiff wanted to wait and see if medication, alone, was effective. (R. at 339 – 42).

Dr. Cermak recorded continued nerve pain in Plaintiff's left arm, despite improved functionality and pain management therapy, in a June 2010 treatment note. (R. at 323 – 24). Plaintiff was to undergo more EMG testing to see if another surgical intervention could relieve Plaintiff's discomfort. (R. at 323 – 24). At a follow-up appointment in July 2010, EMG testing demonstrated worsening of the left ulnar nerve. (R. at 325 – 26). Surgical intervention was recommended. (R. at 325 – 26).

In a July treatment note, Dr. Gerhart indicated that Plaintiff was obtaining relief from pain with Lyrica, but was having difficulty with drowsiness. (R. at 332 – 33). A physical examination revealed "good" grip strength in Plaintiff's left hand. (R. at 332 – 33). However,

Plaintiff experienced a "subjective burning sensation" with palpation. (R. at 332 – 33). It was noted that Plaintiff was to undergo another surgery. (R. at 332 – 33).

Dr. Cermak performed neurolysis with neuragen tube placement on Plaintiff's left arm on September 7, 2010 in an effort to treat her ulnar neuritis. (R. at 230). During the surgical procedure, a significant amount of scar tissue was found. (R. at 230). Plaintiff was referred for further physical therapy after the surgery. (R. at 328 – 39). Plaintiff engaged in therapy during September and October 2010. (R. at 239).

In an October 27, 2010 summary of Plaintiff's physical therapy progress, Plaintiff was noted to complain of constant burning pain in her left hand and wrist. (R. at 239). Plaintiff's pain worsened with use of her left hand. (R. at 239). Left wrist/hand range of motion was within normal limits. (R. at 239). Strength in the left hand was between three and four, on a scale of five. (R. at 239). Plaintiff's left hand grip strength was eighteen pounds. (R. at 239). Despite attempted strengthening and stretching exercises, Plaintiff's complaints of pain did not decrease appreciably. (R. at 239).

In an October 28, 2010 examination note, Dr. Cermak indicated that Plaintiff continued to complain of pain and difficulty with her left hand. (R. at 330 – 31). Yet, Dr. Cermak observed that Plaintiff was capable of doing crafts and making jewelry with her left hand "without much difficulty." (R. at 330 – 31). Dr. Cermak also noted that Plaintiff used her left hand "quite a bit" on a daily basis. (R. at 330 – 31). Plaintiff's grip strength in her left hand was thirty five pounds. (R. at 330 – 31). Some atrophy in the left hand was seen, but Plaintiff was not experiencing numbness. (R. at 330 – 31).

5. <u>Functional Capacity Assessments</u>

Physical therapist Donna Mahoney completed a functional capacity assessment regarding Plaintiff's physical limitations on October 29, 2007. (R. at 281 – 98). Plaintiff's diagnosis was noted to be ulnar neuropathy of the left hand and arm. (R. at 281 – 98). Following a physical examination, Ms. Mahoney determined that Plaintiff would be capable of sedentary work on a full-time basis. (R. at 281 – 98). Plaintiff would, however, be limited to jobs not requiring lifting or carrying over ten pounds, repetitive left elbow extension and flexion, crawling, left sided repetitive gripping, working in a cold environment, left sided pushing and pulling, and machine-paced work. (R. at 281 – 98). Based upon objective indicators and inconsistencies in examination responses, Ms. Mahoney believed that Plaintiff was exaggerating her level of pain. (R. at 281 – 98).

On November 1, 2007, Byron E. Hillin, Ph.D. completed a Psychological Evaluation of Plaintiff. (R. at 270 – 80). Dr. Hillin noted that Plaintiff had never engaged in psychiatric treatment. (R. at 270 – 80). Based upon his interview with Plaintiff and various tests performed during the evaluation, Dr. Hillin concluded that Plaintiff suffered from mild adjustment disorder with mixed anxiety and depression. (R. at 270 – 80). Her GAF score was 70. (R. at 270 – 80). Plaintiff was found to require continuing treatment for her chronic pain, and a mild anti-depressant/antianxiety medication. (R. at 270 – 80). Plaintiff's depression and anxiety were mild, and mostly related to psychosocial stressors. (R. at 270 – 80). Plaintiff's ability to complete tasks in a timely fashion was compromised due to pain, and she would likely need constant breaks. (R. at 270 – 80).

A Physical Residual Functional Capacity Assessment ("RFC") was completed by state agency evaluator Nghia Van Tran, M.D. on March 25, 2010. (R. at 222 – 28). Based upon her

review of the record, Dr. Van Tran believed that medical evidence supported finding impairment in the way of left ulnar neuropathy. (R. at 222 – 28). As a result, she believed that Plaintiff would be limited to occasionally lifting and carrying twenty pounds, frequently lifting and carrying ten pounds, standing and walking approximately six hours of an eight hour work day, and sitting approximately six hours. (R. at 222 – 28). Additionally, Plaintiff would have manipulative limitations with respect to "feeling." (R. at 222 – 28). She was not otherwise functionally limited. (R. at 222 – 28). Dr. Van Tran noted EMG testing showing severe left ulnar neuropathy, and Plaintiff underwent submuscular transposition of the ulnar nerve in an attempt to relieve her pain. (R. at 222 – 28). A 2006 EMG demonstrated improvement. (R. at 222 – 28). Physical examinations revealed difficulty with pain and numbness, particularly when picking up heavy objects. (R. at 222 – 28).

Dr. Gerhart wrote a letter on behalf of Plaintiff for her disability claim on April 13, 2011. (R. at 359). The doctor explained that as a result of two medications Plaintiff took for her pain, Plaintiff experienced fatigue and somnolence. (R. at 359). It was believed that these symptoms would interfere with Plaintiff's daily functioning to some undefined degree. (R. at 359). Plaintiff was on the lowest possible dose of her medications to minimize the side-effects. (R. at 359).

**B.** **ANALYSIS**

1. Standard of Review

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months.

42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[5], 1383(c)(3)[6]; *Schaudeck v.*

---

[5]    Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[6]    Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

*Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

---

42 U.S.C. § 1383(c)(3).

2. <u>Discussion</u>

The ALJ determined that Plaintiff suffered severe medically determinable impairments in the way of left hand ulnar neuropathy with hand atrophy. (R. at 22). Due to these impairments, the ALJ determined that Plaintiff would only be capable of light work involving lifting and carrying ten pounds frequently and twenty pounds occasionally with the right hand, and ten pounds occasionally with the left hand when performing repetitive tasks. (R. at 23). Additionally, Plaintiff could not use her left hand and arm for anything other than support of the right arm and hand, or for any overhead reaching. (R. at 23). Plaintiff could perform simple, routine, repetitive non-production pace tasks, and needed to avoid unprotected heights and dangerous machinery. (R. at 23). In spite of the above limitations, and based upon the testimony of a vocational expert at Plaintiff's administrative hearing, the ALJ found that Plaintiff was still eligible for a significant number of jobs in existence in the national economy. (R. at 25 – 26, 54 – 56). As a result, Plaintiff was not considered to be disabled under the Act. (R. at 26).

Plaintiff objects to the decision of the ALJ, arguing that the ALJ erred in failing to ask any "thoughtful or probative questions" during the administrative hearing, in failing to adequately discuss Plaintiff's alleged depression and anxiety in his decision, in failing to find Plaintiff disabled at Step 3 under 20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.04, in failing to give the opinions of Drs. Cermak and Gerhart controlling weight, and in failing to give Plaintiff's subjective complaints full weight. (ECF No. 10 at 8 - 17 – 21). Defendant counters that the ALJ properly supported his decision with substantial evidence, and should be affirmed. (ECF No. 14 at 9 – 14). The court agrees with Defendant.

A. *Administrative Hearing*

Plaintiff identifies a number of issues with the administrative hearing which she believes justifies remanding the case. The first issue is with the ALJ's alleged failure to "ask any thoughtful or probative questions that could have elicited direct testimony relative to the plaintiff's application for disability benefits." (ECF No. 10 at 9). Under the Act, Plaintiff has a right to a hearing at which witnesses may testify and evidence may be submitted. *Ventura v. Shalala*, 55 F. 3d 900, 902 (3d Cir. 1995) (citing 42 U.S.C. § 405(b)(1)). This hearing, while informal, must be both full and fair. *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 – 02 (1971); *Hess v. Sec'y of Health, Educ., and Welfare*, 497 F. 2d 837, 840 – 41 (3d Cir. 1974)). The ALJ is required to develop a full and fair record, and must obtain relevant information about a claimant's entitlement to disability benefits. *Id.* However, "the conduct of the hearing rests generally in the examiner's discretion," and the "burden is upon the claimant to prove his disability." *Richardson*, 402 U.S. at 400; *Ventura*, 55 F. 3d at 902.

Plaintiff outlined seventeen questions asked by the ALJ during Plaintiff's testimony. Plaintiff claimed that only eleven of those questions dealt with her medical limitations, and that the ALJ should have asked more questions. Yet, Plaintiff fails to suggest the questions she claims should have been asked by the ALJ. In any event, Plaintiff demonstrates that her attorney educed testimony which indicated that she experienced significant limitation in the use of her left arm due to pain, numbness, and decreased strength, that her medications provided her with minimal relief and had significant side-effects such as fatigue and somnolence, that she had poor sleep patterns, that she had difficulty with concentration and persistence, and that she had sought mental health counseling. (ECF No. 10 at 8 – 12). If this information was the information she believes the ALJ should have attempted to elicit, it was received at the hearing, nonetheless.

Further, the present case is not akin to one in which a claimant was without the aid of counsel, and for whom the ALJ has an affirmative duty to help develop the record, and "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Reefer v. Barnhart*, 326 F. 3d 379, 380 (3d Cir. 2003). "Under ordinary circumstances, a claimant's attorney or lay representative would be expected to pose questions to the claimant designed to extract testimonial evidence of functional limitations that would preclude the claimant from engaging in substantial gainful activity." *Pryor v. Astrue*, 2009 WL 890581 at *5 (W.D. Pa. Mar. 27, 2009). Here, if indeed there was a failure by the ALJ to fully and completely elicit all relevant testimony from Plaintiff regarding her functional limitations, Plaintiff's counsel was afforded ample opportunity to do so, and Plaintiff makes no argument to the contrary. The court sees no reason to find error in the ALJ's conduct during the administrative hearing.

Plaintiff next takes issue with alleged inaccuracies in the transcription of the hearing testimony. (ECF No. 10 at 7, 14). Plaintiff directs the court's attention to the repeated reference to Plaintiff's attorney by the incorrect name. Plaintiff also states that the vocational expert's testimony regarding the number of jobs available to an individual who could be expected to remain off-task for more than ten percent of any given work day was misquoted. Plaintiff contends that the vocational expert's response was:

"[I]f they were off work more than 10% of the day then I'd say none."

(ECF No. 10 at 13). The transcript records the vocational expert's response as:

"More than 10 percent. I'd say no more."

(R. at 56). Even if the alleged discrepancy in the vocational expert's testimony were taken as true, the court finds Plaintiff's argument to be a distinction without a difference. It appears that the vocational expert merely repeated the limitation portion of Plaintiff's hypothetical question

17

before replying that there would be no more jobs. Moreover, Plaintiff does not explain how such a finding changes the ultimate disposition of the case. No evidence is provided to justify an assertion that Plaintiff would be off-task more than ten percent of any work day. The court finds no error requiring remand on this point.

B. *Step 2 and Step 3 Determinations*

Plaintiff next asserts that the ALJ should have found that Plaintiff had severe impairments in the way of depression and anxiety, and should also have found Plaintiff qualified for disability under Listing 12.04. (ECF No. 10 at 11 – 14). With respect to finding "severe" limitations at Step 2 of the ALJ's analysis, a "severe" impairment is defined by regulation as "any impairment . . . which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). In practice, the ALJ's analysis at Step 2 to determine whether or not an alleged impairment is "severe," is no more than a "*de minimis* screening device to dispose of groundless claims." *Magwood v. Comm'r of Soc. Sec.*, 417 Fed. App'x 130, 132 (3d Cir. 2008) (quoting *Newell v. Comm'r of Soc. Sec.*, 347 F. 3d 541, 546 (3d Cir. 2003)). Impairment is not "severe" where the record demonstrates only "slight abnormality or a combination of slight abnormalities which have 'no more than a minimal effect on an individual's ability to work.'" *Id.*

Presently, Plaintiff points to no objective evidence from the medical record indicating that Plaintiff experienced any more than minimal functional limitation as the result of either depression or anxiety. While it is Plaintiff's contention that medical evidence in the form of treatment notes from Safe Harbor Behavioral Health established the claimed mental impairments, the court disagrees. (ECF No. 10 at 12). Plaintiff claims that these records were properly submitted to the ALJ for consideration prior to his decision, but not addressed by the

ALJ or included within the administrative record. Indeed, the hearing transcript reflects that Plaintiff requested that the ALJ leave the record open so she could submit this evidence (R. at 57), but there is no evidence of submission of treatment records from Safe Harbor Behavioral Health, and the ALJ stated as much in his decision. (R. at 24). Plaintiff makes no offer of proof to contradict this statement.

In addition, Plaintiff did not attempt to submit this evidence to the Appeals Council, and she did not argue to the Appeals Council that this evidence had been properly submitted to the ALJ, or ignored by the ALJ. (R. at 198 – 202). Records from Safe Harbor Behavioral Health formed no part of the basis for Plaintiff's appeal of the ALJ's decision. (R. at 198 – 202). It is also telling that Plaintiff made no attempt to submit said records to the court in order to argue for remand under sentence six of 42 U.S.C. § 405(g). This court will not rely upon the bare allegation that evidence which the court does not have the benefit of viewing justifies remand. As such, the court will not find that the ALJ's treatment of purportedly relevant records from Safe Harbor Behavioral Health – to the extent these records even exist – merits remand.

C. *Treating Physicians Opinions*

Plaintiff's third point of contention is with the ALJ's alleged failure to accord the medical findings of Drs. Cermak and Gerhart proper weight – findings which, allegedly, would have supported a finding of disability if properly credited. (ECF No. 10 at 19 – 20). The United States Court of Appeals for the Third Circuit has held that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Comm'r of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F. 3d

310, 317 (3d Cir. 2000)); *Plummer v. Apfel*, 186 F. 3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F. 2d 1348, 1350 (3d Cir. 1987)).

Here, however, while Plaintiff argues that the findings of Drs. Cermak and Gerhart should have been given controlling weight, Plaintiff fails to indicate which findings by either of these doctors would have altered the ALJ's RFC or rendered Plaintiff incapable of substantial gainful activity. As discussed by the ALJ, Plaintiff's treating physicians noted that despite Plaintiff's subjective complaints of pain, she experienced objective improvement in both strength and functioning in the left arm. (R. at 24). The ALJ took into account Plaintiff's objectively supported complaints of difficulty with fatigue and somnolence due to the effects of her pain medication, as well as Plaintiff's complaint that she had difficulty with concentration. (R. at 24). The ALJ accommodated all of these issues by relegating Plaintiff to sedentary jobs with sharp limits on use of the left arm, no involvement with unprotected heights or dangerous machines, and requiring Plaintiff to work on only simple, routine, repetitive tasks at a non-production pace. (R. at 23). Plaintiff fails to indicate why this was insufficient, or how Drs. Cermak and Gerhart's treatment notes conflicted with the above accommodations. Therefore, the court finds that the ALJ's RFC assessment was supported by substantial evidence from the record.

D. *Subjective Complaints*

Plaintiff last objects to the ALJ's alleged disregard of her subjective complaints of pain and limitation when formulating his hypothetical question and RFC. (ECF No. 10 at 20 – 21). It is established in the Third Circuit that an ALJ should accord subjective complaints of pain similar treatment as objective medical reports, and weigh the evidence before him. *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 122 (3d Cir. 2000). Serious consideration must be given to subjective complaints of pain where a medical condition could reasonably produce such pain.

*Mason v. Shalala*, 994 F. 2d 1058, 1067 – 68 (3d Cir. 1993). The ALJ is required to assess the intensity and persistence of a claimant's pain, and determine the extent to which it impairs a claimant's ability to work. *Hartranft v. Apfel*, 181 F. 3d 358, 362 (3d Cir. 1999). This includes determining the accuracy of a claimant's subjective complaints of pain. *Id.* While pain itself may be disabling, and subjective complaints of pain may support a disability determination, allegations of pain suffered must be consistent with the objective medical evidence on record. *Ferguson v. Schweiker*, 765 F. 2d 31, 37 (3d Cir. 1985); *Burnett*, 220 F. 3d at 122.

The court finds that the ALJ adequately dealt with Plaintiff's complaints of pain and limitation, noting that the severity of her limitation was not generally reflected in her treatment records, particularly with respect to increases in strength and functionality. (R. at 23 – 25). Plaintiff saw improvement with surgery and medication. (R. at 24). Although medication side-effects increased Plaintiff's fatigue and somnolence, the ALJ accommodated these issues in his RFC. (R. at 23). Substantial evidence supported the ALJ's treatment of Plaintiff's subjective complaints.

## C. CONCLUSION

Based upon the foregoing, the ALJ supported his decision with substantial evidence. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be denied, Defendant's Motion for Summary Judgment be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party

opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

April 16, 2013

*s/ Susan Paradise Baxter*
Susan Paradise Baxter
United States Magistrate Judge

cc/ecf: All counsel of record.